JS 44C/SDNY
REV. 5/2010

# CIVIL COVER SHEET

COPY

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Steven Goldstein | Citigroup, Inc. et al., (See attached Rider A for a complete listing of all named Defendants) |
| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER | ATTORNEYS (IF KNOWN) |
| Stull, Stull & Brody, 6 East 45th Street, Suite 500, New York, NY 10017 (212) 687-7230 | |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Sections 502(a)(2) & (a)(3) of ERISA, 29 U.S.C. Sections 1132(a)(2) & (a)(3). Breach of ERISA's fiduciary duties.

Has this or a similar case been previously filed in SDNY at any time? No? [✓] Yes? [ ] Judge Previously Assigned

If yes, was this case Vol. [ ] Invol. [ ] Dismissed. No [ ] Yes [ ] If yes, give date ______________ & Case No. ______________

*(PLACE AN [x] IN ONE BOX ONLY)* NATURE OF SUIT

## TORTS

### CONTRACT

[ ] 110 INSURANCE
[ ] 120 MARINE
[ ] 130 MILLER ACT
[ ] 140 NEGOTIABLE INSTRUMENT
[ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151 MEDICARE ACT
[ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
[ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS
[ ] 160 STOCKHOLDERS SUITS
[ ] 190 OTHER CONTRACT
[ ] 195 CONTRACT PRODUCT LIABILITY
[ ] 196 FRANCHISE

### PERSONAL INJURY

[ ] 310 AIRPLANE
[ ] 315 AIRPLANE PRODUCT LIABILITY
[ ] 320 ASSAULT, LIBEL & SLANDER
[ ] 330 FEDERAL EMPLOYERS' LIABILITY
[ ] 340 MARINE
[ ] 345 MARINE PRODUCT LIABILITY
[ ] 350 MOTOR VEHICLE
[ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
[ ] 360 OTHER PERSONAL INJURY

### PERSONAL INJURY

[ ] 362 PERSONAL INJURY - MED MALPRACTICE
[ ] 365 PERSONAL INJURY PRODUCT LIABILITY
[ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

### PERSONAL PROPERTY

[ ] 370 OTHER FRAUD
[ ] 371 TRUTH IN LENDING
[ ] 380 OTHER PERSONAL PROPERTY DAMAGE
[ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

## ACTIONS UNDER STATUTES

### FORFEITURE/PENALTY

[ ] 610 AGRICULTURE
[ ] 620 OTHER FOOD & DRUG
[ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 630 LIQUOR LAWS
[ ] 640 RR & TRUCK
[ ] 650 AIRLINE REGS
[ ] 660 OCCUPATIONAL SAFETY/HEALTH
[ ] 690 OTHER

### LABOR

[ ] 710 FAIR LABOR STANDARDS ACT
[ ] 720 LABOR/MGMT RELATIONS
[ ] 730 LABOR/MGMT REPORTING & DISCLOSURE ACT
[ ] 740 RAILWAY LABOR ACT
[ ] 790 OTHER LABOR LITIGATION
[X] 791 EMPL RET INC SECURITY ACT

### BANKRUPTCY

[ ] 422 APPEAL 28 USC 158
[ ] 423 WITHDRAWAL 28 USC 157

### PROPERTY RIGHTS

[ ] 820 COPYRIGHTS
[ ] 830 PATENT
[ ] 840 TRADEMARK

### SOCIAL SECURITY

[ ] 861 HIA (1395ff)
[ ] 862 BLACK LUNG (923)
[ ] 863 DIWC/DIWW (405(g))
[ ] 864 SSID TITLE XVI
[ ] 865 RSI (405(g))

### FEDERAL TAX SUITS

[ ] 870 TAXES (U.S. Plaintiff or Defendant)
[ ] 871 IRS-THIRD PARTY 26 USC 7609

### OTHER STATUTES

[ ] 400 STATE REAPPORTIONMENT
[ ] 410 ANTITRUST
[ ] 430 BANKS & BANKING
[ ] 450 COMMERCE
[ ] 460 DEPORTATION
[ ] 470 RACKETEER INFLUENCED & CORRUPT ORGANIZATION ACT (RICO)
[ ] 480 CONSUMER CREDIT
[ ] 490 CABLE/SATELLITE TV
[ ] 810 SELECTIVE SERVICE
[ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE
[ ] 875 CUSTOMER CHALLENGE 12 USC 3410
[ ] 890 OTHER STATUTORY ACTIONS
[ ] 891 AGRICULTURAL ACTS
[ ] 892 ECONOMIC STABILIZATION ACT
[ ] 893 ENVIRONMENTAL MATTERS
[ ] 894 ENERGY ALLOCATION ACT
[ ] 895 FREEDOM OF INFORMATION ACT
[ ] 900 APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE
[ ] 950 CONSTITUTIONALITY OF STATE STATUTES

### REAL PROPERTY

[ ] 210 LAND CONDEMNATION
[ ] 220 FORECLOSURE
[ ] 230 RENT LEASE & EJECTMENT
[ ] 240 TORTS TO LAND
[ ] 245 TORT PRODUCT LIABILITY
[ ] 290 ALL OTHER REAL PROPERTY

## ACTIONS UNDER STATUTES

### CIVIL RIGHTS

[ ] 441 VOTING
[ ] 442 EMPLOYMENT
[ ] 443 HOUSING/ ACCOMMODATIONS
[ ] 444 WELFARE
[ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT
[ ] 446 AMERICANS WITH DISABILITIES -OTHER
[ ] 440 OTHER CIVIL RIGHTS

### PRISONER PETITIONS

[ ] 510 MOTIONS TO VACATE SENTENCE 20 USC 2255
[ ] 530 HABEAS CORPUS
[ ] 535 DEATH PENALTY
[ ] 540 MANDAMUS & OTHER
[ ] 550 CIVIL RIGHTS
[ ] 555 PRISON CONDITION

### IMMIGRATION

[ ] 462 NATURALIZATION APPLICATION
[ ] 463 HABEAS CORPUS-ALIEN DETAINEE
[ ] 465 OTHER IMMIGRATION ACTIONS

*Check if demanded in complaint:*

[X] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $____________ OTHER ____________

*Check YES only if demanded in complaint*
JURY DEMAND: [✓] YES [ ] NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
IF SO, STATE:

JUDGE John G. Koeltl DOCKET NUMBER 11-CV-7672

NOTE: Please submit at the time of filing an explanation of why cases are deemed related.

(PLACE AN x IN ONE BOX ONLY)

## ORIGIN

☑ 1 Original Proceeding
☐ 2a. Removed from State Court
☐ 2b. Removed from State Court AND at least one party is pro se.
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from (Specify District)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judge Judgment

(PLACE AN x IN ONE BOX ONLY)

## BASIS OF JURISDICTION

☐ 1 U.S. PLAINTIFF ☐ 2 U.S. DEFENDANT ☑ 3 FEDERAL QUESTION (U.S. NOT A PARTY) ☐ 4 DIVERSITY

***IF DIVERSITY, INDICATE CITIZENSHIP BELOW. (28 USC 1322, 1441)***

## CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

| | PTF | DEF | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

Steven Goldstein
4 Jackson Drive
Livingston, NJ 07039
Essex County

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

All Defendants c/o:
Citigroup, Inc.
399 Park Avenue
New York, NY 10043
New York County
(See attached Rider A for a complete listing of all named Defendants)

DEFENDANT(S) ADDRESS UNKNOWN

REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one: THIS ACTION SHOULD BE ASSIGNED TO: ☐ WHITE PLAINS ☑ MANHATTAN
(DO NOT check either box if this a PRISONER PETITION.)

DATE 12/07/11 SIGNATURE OF ATTORNEY OF RECORD

ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
[x] YES (DATE ADMITTED Mo. 07 Yr. 88)
Attorney Bar Code # EM 7117

RECEIPT #

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge ______________________ is so Designated.

Ruby J. Krajick, Clerk of Court by ____________ Deputy Clerk, DATED ______________.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

# RIDER A

List of all Defendants:

CITIGROUP, INC., THE ADMINISTRATION COMMITTEE OF CITIGROUP, INC., RICHARD TAZIK, JORGE BERMUDEZ, MICHAEL BURKE, LARRY JONES, THOMAS SANTANGELO, THE CITIGROUP 401(K) PLAN INVESTMENT COMMITTEE, LEO VIOLA, DONALD YOUNG, ROBERT GROGAN, ROBIN LEOPOLD, GLENN REGAN, CHRISTINE SIMPSON, TIMOTHY TUCKER, MARCIA YOUNG, WIN BISCHOFF, KENNETH DERR, ROBERTO HERNANDEZ, ROBERT RUBIN, FRANKLIN THOMAS, C. MICHAEL ARMSTRONG, ALAIN J.P. BELDA, JOHN M. DEUTCH, ANDREW N. LIVERIS, ANNE M. MULCAHY, VIKRAM S. PANDIT, RICHARD D. PARSONS, JUDITH RODIN, LAWRENCE R. RICCIARDI, ROBERT L. RYAN and JOHN DOES 1-10,

COPY

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT
OF NEW YORK**

STEVEN GOLDSTEIN, on Behalf of Himself and a Class of Persons Similarly Situated,

Plaintiff,

v.

CITIGROUP, INC., THE ADMINISTRATION COMMITTEE OF CITIGROUP, INC., RICHARD TAZIK, JORGE BERMUDEZ, MICHAEL BURKE, LARRY JONES, THOMAS SANTANGELO, THE CITIGROUP 401(K) PLAN INVESTMENT COMMITTEE, LEO VIOLA, DONALD YOUNG, ROBERT GROGAN, ROBIN LEOPOLD, GLENN REGAN, CHRISTINE SIMPSON, TIMOTHY TUCKER, MARCIA YOUNG, WIN BISCHOFF, KENNETH DERR, ROBERTO HERNANDEZ, ROBERT RUBIN, FRANKLIN THOMAS, C. MICHAEL ARMSTRONG, ALAIN J.P. BELDA, JOHN M. DEUTCH, ANDREW N. LIVERIS, ANNE M. MULCAHY, VIKRAM S. PANDIT, RICHARD D. PARSONS, JUDITH RODIN, LAWRENCE R. RICCIARDI, ROBERT L. RYAN and JOHN DOES 1-10,

Defendants.

__-CV-____

**RELATED CASE AFFIRMATION**

**STULL, STULL & BRODY**
Edwin J. Mills
Howard T. Longman
Michael J. Klein
6 East 45th Street
New York, New York 10017
Tel: (212) 687-7230
Fax: (212) 490-2022

**Attorneys for Plaintiffl,**

I, EDWIN J. MILLS, hereby affirm the following:

1. I am a senior attorney with the law firm of Stull, Stull & Brody, counsel for plaintiff in the above-captioned action, which asserts violations of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

2. Upon information and belief, this action is related to the action captioned Geroulo v. Citigroup, Inc.,et al., 11 CV 7672 (JGK), which is pending in this Court and alleges similar violations of the ERISA statute.

3. Accordingly, it is respectfully submitted that this action should be assigned as a related case to the Honorable John G. Koeltl.

Dated: December 8, 2011

Edwin J. Mills

COPY

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT**
**OF NEW YORK**

| | |
|---|---|
| STEVEN GOLDSTEIN, on Behalf of Himself and a Class of Persons Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CITIGROUP, INC., THE ADMINISTRATION COMMITTEE OF CITIGROUP, INC., RICHARD TAZIK, JORGE BERMUDEZ, MICHAEL BURKE, LARRY JONES, THOMAS SANTANGELO, THE CITIGROUP 401(K) PLAN INVESTMENT COMMITTEE, LEO VIOLA, DONALD YOUNG, ROBERT GROGAN, ROBIN LEOPOLD, GLENN REGAN, CHRISTINE SIMPSON, TIMOTHY TUCKER, MARCIA YOUNG, WIN BISCHOFF, KENNETH DERR, ROBERTO HERNANDEZ, ROBERT RUBIN, FRANKLIN THOMAS, C. MICHAEL ARMSTRONG, ALAIN J.P. BELDA, JOHN M. DEUTCH, ANDREW N. LIVERIS, ANNE M. MULCAHY, VIKRAM S. PANDIT, RICHARD D. PARSONS, JUDITH RODIN, LAWRENCE R. RICCIARDI, ROBERT L. RYAN and JOHN DOES 1-10,<br><br>Defendants. | 11 CIV 8999<br><br>CLASS ACTION<br><br>COMPLAINT FOR BREACH OF ERISA'S FIDUCIARY DUTIES<br><br>JURY TRIAL DEMANDED<br><br>RECEIVED<br>DEC 09 2011<br>U.S.D.C. S.D. N.Y.<br>CASHIERS |


**STULL, STULL & BRODY**
Edwin J. Mills
Howard T. Longman
Michael J. Klein
6 East 45th Street
New York, New York 10017
Tel: (212) 687-7230
Fax: (212) 490-2022

**Attorneys for Plaintiff**

Steven Goldstein ("Plaintiff"), on behalf of himself and on behalf of a class of similarly-situated participants and beneficiaries (the "Participants") of The Citigroup 401(k) Plan (the "Plan"), by his attorneys, allege the following for his Complaint. The allegations contained herein are based upon the investigation of counsel, except for those allegations pertaining to Plaintiff, which are based upon personal knowledge.

## NATURE OF ACTION

1. Plaintiff, who was a Participant in the Plan and held shares of Citigroup, Inc. (hereinafter "Citigroup" or the "Company") common stock or units of the Citigroup Common Stock Fund (the "Fund")[1] in his Plan account between November 3, 2008 and March 5, 2009 (hereinafter the "Class Period"), brings this civil enforcement action under Section 502(a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a), for Plan-wide relief on behalf of the Plan, and to the extent deemed by the Court to be necessary or appropriate, on behalf of a class consisting of all current and former participants in the Plan (and the beneficiaries of such participants) for whose individual accounts the Plan held shares of Citigroup common stock or units of the Fund at any time during the Class Period. Plaintiff brings this action pursuant to §§ 502(a)(2) and (a)(3) of ERISA, 29 U.S.C. §§ 1132(a)(2) and (a)(3).

2. As more fully set forth below, Defendants breached their fiduciary duties to the Plan and the Participants, including the fiduciary duties of prudence and loyalty set forth in ERISA § 404(a), 29 U.S.C. § 1104(a), and Department of Labor Regulations, including 29

---

[1] The Fund is a Plan investment option which invests primarily in shares of Citigroup common stock and holds a small amount of cash or cash equivalents to facilitate Participant transactions. The Fund and Citigroup common stock are used interchangeably through this Complaint unless otherwise indicated.

C.F.R. § 2550. Defendants breached their fiduciary duties to the Plan and the Participants by (i) failing to manage and administer the Plan's assets with the care, skill, prudence and diligence of a prudent person under the circumstances; (ii) investing Plan assets in Citigroup common stock when Citigroup common stock was an imprudent investment option for the Plan; (iii) failing to inform Participants about the true risk and return characteristics of Citigroup common stock and the suitability of Citigroup common stock as a retirement savings investment, and (iv) permitting the Participants to invest their retirement savings in Citigroup common stock when the price of Citigroup common stock was substantially artificially inflated in price

3. Plaintiff alleges that it was imprudent to permit the Plan to offer the Fund as an investment option, to permit the Plan to invest in the Fund and/or to permit the Fund to invest in Company stock because objective, publicly available information established that the Fund and Company stock were extremely risky investments which were entirely inappropriate and unsuitable for the investment of retirement savings. As set forth below, Citigroup's financial condition had deteriorated to the point that, by the start of the Class Period on November 3, 2008, Citigroup was in dire circumstances and on the verge of collapse. Indeed, as discussed herein, Citigroup would have collapsed had it not been for an enormous and virtually unprecedented infusion of taxpayer money; absent that infusion of taxpayer money Citigroup would have suffered the same fate as Lehman Brothers. It would have failed, and the Citigroup stock in Participants' accounts would have become worthless or virtually so.

4. In addition to the imprudent investment allegations, Plaintiff further alleges that those Defendants who had a duty to appoint and monitor the fiduciaries with authority or control over the management or administration of Plan assets breached their duty to properly appoint, monitor and inform such appointees.

5. As a result of these wrongful acts, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants are personally liable to make good to the Plan the losses resulting from each such breach of fiduciary duty. In addition, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff seek appropriate equitable relief including, without limitation, the equitable remedy of surcharge, restitution, monetary relief, and lost profits calculated on both an individual Participant account basis and on a Plan-wide basis.

## JURISDICTION AND VENUE

6. Plaintiff's claims arise under and pursuant to ERISA § 502, 29 U.S.C. § 1132.

7. This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

8. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because this is a District where the Plan was administered, where breaches of fiduciary duty took place and/or where one or more Defendants, including Citigroup, reside or may be found.

## THE PARTIES

### Plaintiff

9. Plaintiff Steven Goldstein is a resident of the State of New Jersey. Plaintiff was a participant in the Plan during the Class Period and held shares of common stock of BofA and/or units of the Fund in his Plan account during the Class Period and was injured thereby.

### Defendants

#### Citigroup

10. Defendant Citigroup is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in New York, New York. Citigroup is the Sponsor of the Plan.

11. Throughout the Class Period Citigroup exercised effective control over the activities of its directors, officers and employees, including the other Defendants named herein, in connection with their Plan-related activities. The Company also had the authority and discretion to appoint, monitor, and remove individual officers and employees, including members of the committees defined below. It was Citigroup, acting though its CEO Vikram Pandit, which issued a company-wide communication to its employees (including the Participants) on November 17, 2008 assuring employees that its capital position was "very strong" and that the Company is "in a strong competitive position to take advantage of future opportunities. We will be the long term winner in the industry"—this just a week before receiving a $326 billion taxpayer-funded bailout to prevent its collapse.

**The Administration Committee Defendants**

12. Defendant The Administration Committee of Citigroup, Inc. is, on information and belief, an unincorporated association composed entirely of Citigroup employees and is the Administrator of the Plan.

13. Upon information and belief, Defendants Richard Tazik (who was also Citigroup Vice President, Compensation and Benefits), Jorge Bermudez (who was also Chief Risk Officer), Michael Burke (who was also Head of Global Compliance), Larry Jones (Director of International Operations) and Thomas Santangelo (Chief Financial Officer – Citi Shared Services) were members of The Administration Committee. Defendants Tazik, Bermudez, Burke, Jones and Santangelo, together with The Administration Committee of Citigroup, Inc., are hereinafter referred to as the "Administration Committee."

**The Investment Committee Defendants**

14. Defendant The Citigroup 401(k) Plan Investment Committee is, on information and belief, an unincorporated association composed entirely of Citigroup employees and was the Investment Fiduciary of the Plan.

15. Upon information and belief, Defendants Leo Viola (who was also Citigroup Controller), Donald Young (who was also Assistant Treasurer), Richard Tazik (who was also Vice President, Compensation and Benefits), Robert Grogan (Chief Investment Officer-Global Pension Investments), Robin Leopold (who was also Director Human Resources), Glenn Regan (who was also Chief Investment Officer), Christine Simpson (who was also Managing Director), Timothy Tucker (who was also a Citigroup Managing Director, Equity Research Oversight Committee) and Marcia Young (who was also a Citigroup Risk Manager) were members of The Citigroup 401(k) Plan Investment Committee. Defendants Viola, Donald Young, Tazik, Grogan, Leopold, Regan, Simpson, Tucker and Marcia Young, together with The Citigroup 401(k) Plan Investment Committee, are hereinafter referred to as the "Investment Committee" and, together with the Administration Committee (as defined), the "Committees."

**The Director Defendants**

16. Defendants Win Bischoff, Kenneth Derr, Roberto Hernandez, Robert Rubin, Franklin Thomas, C. Michael Armstrong, Alain J.P. Belda, John M. Deutch, Andrew N. Liveris, Anne M. Mulcahy, Vikram S. Pandit, Richard D. Parsons, Judith Rodin, Lawrence R. Ricciardi and Robert L. Ryan (collectively the "Director Defendants") were members of the Citigroup Board of Directors. On information and belief, the Director Defendants have the duty to properly appoint, monitor and inform the Committees (as herein defined).

**Unknown "John Doe" Defendants 1-10**

17. Unknown "John Doe" Defendants 1-10, without limitation, include other committees and individuals, including other members of the Committee, and the members of any other Plan administrative, managing or fiduciary committee(s), who were named fiduciaries, *de facto* fiduciaries or functional fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period. The identities of the John Doe Defendants are currently unknown to Plaintiff and, once their identities are ascertained, Plaintiff will seek leave to add them as Defendants in the instant action under their true names.

**CLASS ACTION ALLEGATIONS**

18. To the extent deemed by the Court to be necessary or appropriate, Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1)(B) and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All current and former participants in the Plan (and the beneficiaries of such participants) for whose individual accounts the Plan held common stock of Citigroup (whether as shares of Citigroup common stock or as units of the Fund) at any time from November 3, 2008 through and including March 5, 2009

19. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are at least tens of thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period and whose Plan accounts included investments in Citigroup common stock. The Plan's 2009 Annual Return/Report of Employee Benefit Plan filed with the Department of Labor on Form 5500 on or about October 14, 2010 indicates that as of year-end 2009 there were 193,692 participants in the Plan.

20. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants owed fiduciary duties to the Plan, the Participants and members of the Class;

(b) whether Defendants breached their fiduciary duties to the Plan, the Participants and members of the Class by failing to act prudently and solely in the interests of the Plan and the Participants and beneficiaries;

(c) whether Defendants breached any of ERISA's fiduciary duties; and

(d) whether the Plan, the Participants and/or members of the Class have sustained damages and, if so, what is the proper measure of damages.

21. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, the Plan and members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of ERISA as complained of herein.

22. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Plan, the Participants or the Class.

23. Class action status is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the

interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

24. Class action status is also warranted under Rule 23(b)(3) because the questions of law or fact common to class members predominate over any questions affecting only individual members, and certification of this action as a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

**THE PLAN**

25. The Plan is a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), in that the Plan provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to those accounts, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

26. The Plan is an employee benefit plans within the meaning of ERISA § 3(3) and 3(2)(A), 29 U.S.C. § 1002(3) and 1002(2)(A). According to the Citigroup Plan Summary Plan Description ("SPD"), Citigroup "encourages" Participants to save for their retirements and financial futures through the Plan. According to one of the Plan's Form 11-K Annual Reports, the Plan is "designed to encourage savings on the part of eligible employees." Thus, upon information and belief, in sponsoring the Plan, Citigroup intended that the Plan provide for the retirement savings of Participants.

27. The Plan is a voluntary contribution plan whereby Participants contribute a portion of their employee compensation into the Plan ("Employee Contributions"). According to one of the Plan's Form 11-K Annual Reports, Participants were permitted to contribute on a pre-tax basis from one to fifty percent of their eligible compensation.

28. According to one of the Plan's Form 11-K Annual Reports, the Company made matching contributions to individual Participant Plan accounts in the amount of 6% of Participants' eligible pay up to IRS limits ("Matching Contributions").

29. According to one of the Plan's Form 11-K Annual Reports, Participants could cause the Plan to invest the Contributions held in each of their accounts among a number of "Investment Options" offered by the Plan in whole increments of 1%. Upon information and belief, Citigroup intended that investment options be selected, offered and monitored in accordance with the purposes of the Plan as alleged above.

30. One of the Investment Options which Participants could select for the investment of Employee and Matching Contributions was the Fund. Regardless of whatever the Plan purported to mandate to the Fund, and regardless of any sponsor intent in connection with setting up the Plan, plan fiduciaries may not offer imprudent investment options in ERISA plans—they may only follow purported plan mandates if such purported mandates are otherwise prudent.

31. Under the Plan, all Matching Contributions could be invested in the same way as Employee Contributions.

32. At all times relevant to this Complaint Defendants chose the menu of available Plan investment options, including Company stock.

33. Upon information and belief at no time during the Class Period was a cap or limit imposed on the dollar amount or percentage of an account balance which Participants could invest in Citigroup stock.

34. Defendants, as Plan fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Participants, well-recognized in the 401(k) literature and the trade press, concerning investment in employer stock, including that:

(a) Out of loyalty, employees tend to invest in, and, where applicable, refrain from divesting, company stock;

(b) Employees tend not to change their investment option allocations in a plan once made;[2]

(c) Employees tend to interpret an investment of employee benefit plan assets in company stock as an endorsement of the company and its stock, and

(d) Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward.

35. According to the Plan's Form 11-K Annual Report which was filed with the SEC on or about June 24, 2009, as of year-end 2008 the Plan held 91,341,613 shares of Company common stock, then valued at approximately $612,902,224. Therefore, about 25% of the Plan's assets of $2,402,085,234 were invested in Citigroup common stock as of year-end 2008. According to the Plan's Form 11-K Annual Report which was filed with the SEC on or about May 24, 2010, the Plan held 127,601,110 shares of Company common stock then valued at $422,359,675 at calendar year 2009. The Plan thus acquired approximately 36,259,497 shares of Company stock during 2009 on a net basis.

---

[2] Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia* in 401(k) *Participation and Savings Behavior* 116 Q. J. Econ. 4, 1149 (2001) (available at http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plans – the importance of plan design,* Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.) (available at http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

## DEFENDANTS' FIDUCIARY STATUS

36. ERISA requires every pension plan to provide for one or more named fiduciaries who have "authority to control and manage the operation and administration of the plan." § 402(a)(1), 29 U.S.C. § 1102(a)(1).

37. ERISA also treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, i.e., performed fiduciary functions. Section 3(21)(A)(i) of ERISA, 29 U.S.C. § 1002(21)(A)(i), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of dispositions of its assets . . ."

38. An ERISA fiduciary may not avoid his fiduciary responsibilities under ERISA by relying solely on the language of the plan documents. While the basic structure of a plan may be specified within limits by the plan sponsor, an ERISA fiduciary may not follow the plan document if to do so leads to an imprudent result under ERISA § 404(a)(1)(d), 29 U.S.C. § 1104(a)(1)(D).

39. At all times relevant to this Complaint, Defendants were fiduciaries of the Plan as defined by ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised authority or control respecting management or disposition of Plan assets.

40. The Administration Committee is a fiduciary because it was the "Named Fiduciary" and the Administrator of the Plan, and, on information and belief, because it exercised authority or control over the management or disposition of Plan assets.

41. The Investment Committee is a fiduciary because, on information and belief, it exercised authority or control over the management or disposition of Plan assets. According to a June 2007 Citigroup 401(k) Plan newsletter, the Investment Committee was responsible for providing a menu of investment options that will best serve the needs of participants and

beneficiaries. Accordingly, the Investment Committee was responsible for offering prudent investment options and monitoring the prudence of Plan investments.

42. Citigroup was a *de facto* fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because, *inter alia*:

(a) The Committee Members were, on information and belief, all Citigroup employees serving in that role as part of their employment. On information and belief, Citigroup employees serving on the Committees received no additional compensation for that service.

(b) On information and belief, the Committees delegated some or all of their responsibility for administering the Plan to other Citigroup employees.

(c) On information and belief, the actual members of the Committee spent very little time on matters relating to administration of the Plan and the Plan's investments. Rather, upon information and belief, these jobs were actually performed by Citigroup human resources, legal, corporate communications, finance and treasury personnel.

(d) The Plan's Annual Reports on Form 11-K were signed by Paul McKinnon in his capacity as Citigroup's "Global Head of Human Resources".

43. The Director Defendants were fiduciaries of the Plan because they had the duty to properly appoint, monitor and inform the members of the Committees. They had the power and responsibility to appoint as members of the Committees persons with sufficient education, knowledge and experience to inform themselves as necessary to perform their duties as

committee members, including the duty to evaluate the merits of investment options under the Plan. The Director Defendants also had an ongoing duty to ensure that the persons appointed to the Committees were fully informed and performing their duties properly with respect to the selection of investment options under the Plan and the investment of the assets of the Plan.

## ERISA'S FIDUCIARY DUTIES

44. ERISA imposes strict fiduciary duties upon all plan fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a) requires that

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA's fiduciary duties and certain other ERISA provisions].

45. **The Duty of Loyalty.** ERISA imposes on a plan fiduciary the duty of loyalty that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries. . . ."

46. The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" towards the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

47. **The Duty of Prudence.** Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence - that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

48. **The Duty to Investigate and Monitor Investment Alternatives.** With respect to a pension plan such as the Plan, the duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of the investment alternatives in the Plan including employer securities, to ensure that each investment is a suitable option for the Plan.

49. **The Duty to Properly Appoint, Monitor and Inform Appointed Fiduciaries.** Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor and inform the fiduciaries thus appointed. The duty to monitor entails both giving information to and reviewing the actions of the appointed fiduciaries. In a 401(k) plan such as the Plan, the monitoring fiduciaries must therefore ensure that the appointed fiduciaries:

(a) possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties;

(b) are knowledgeable about the operations of the plan, the goals of the plan and the behavior of plan's participants;

(c) are provided with adequate financial resources to do their jobs;

(d) have adequate information to do their jobs of overseeing plan investments with respect to company stock;

(e) have access to outside, impartial advisors when needed;

(f) maintain adequate records of the information on which they base their decisions and analysis with respect to the plan's investment options, and

(g) report regularly to the monitoring fiduciaries.

The monitoring fiduciaries must then review, understand, and approve the conduct of the monitored fiduciaries.

50. **The Duty to Disregard Plan Documents When Plan Mandates Conflict With ERISA's Fiduciary Duties.** A fiduciary cannot avoid his fiduciary responsibilities by relying solely on the language of the plan documents. While the basic structure of a plan may be specified, within limits, by the plan sponsor, a fiduciary may not blindly follow the plan document if to do so leads to an imprudent result or otherwise violates ERISA's fiduciary duties. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

51. **Co-Fiduciary Liability.** A fiduciary is liable not only for fiduciary breaches within the sphere of his own responsibility, but also as a co-fiduciary in certain circumstances. ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the sameplan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2) if, by his failure to comply with section 404(a)(1) in the administration ofhis specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## SUBSTANTIVE ALLEGATIONS

52. Citigroup was formed by the 1998 merger of Citicorp with the Travelers Group. As a result of numerous acquisitions, Citigroup became a massive one-stop financial services company, including retail and business banking and investment services, investment banking, brokerage and insurance businesses.

53. In 2005, Citigroup shifted its focus from acquisitions to internal growth, with the Company dramatically increasing its exposure to high-growth, fixed income investments such as Collateralized Debt Obligations ("CDOs"). By October of 2007, Citigroup had $43 billion in CDOs on its books, and in its Form 10-K Annual Report for 2007, Citigroup stated that the "reasonable" and "fair value" of its previously-disclosed CDO exposures, after writedowns, was $39.8 billion. As the sub-prime mortgage crisis developed in 2007, these assets became particularly vulnerable.

54. On October 1, 2007, Citigroup informed investors that it would write off $95 million of its CDO portfolio as part of a $1.3 billion write-off of sub-prime mortgage-related assets. However, CDO prices began to collapse as credit rating agencies and brokerage house Merrill Lynch marked down similar securities. By early November, 2007, Citigroup's anticipated CDO write-downs jumped to $8 billion, and then to $11 billion. Citigroup's executives in charge of mortgage-related securities and fixed-income investments lost their jobs, and Citigroup's then-CEO, Charles Prince, announced that he also would resign.

55. On April 1, 2008, *The Wall Street Journal* outlined Citigroup's response to its lack of risk oversight and resulting damaging financial results:

> Citigroup Inc., as it unveiled the final in a flurry of internal organizational changes, appears to be getting started on a restructuring of its board.
>
> The banking giant said in a statement on its Web site that its board "is actively seeking new directors" and is placing a "particular emphasis on expertise in finance and investments."
>
> The board has been criticized by shareholders and, in private, by some Citigroup executives. They are frustrated with the board's failure to sound the alarm as the bank piled up big risks in the years before the credit crunch hit, saddling Citigroup with more than $20 billion in losses since last summer.
>
> The board has few members with experience in financial services. Only two outside directors -- Richard D. Parsons, Time Warner Inc.'s chairman, who ran a New York thrift in the early 1990s, and Robert L. Ryan, who was a Citibank vice president from 1975 to 1982 -- have any banking background. Mr. Ryan, Medtronic Inc.'s chief financial officer, joined the board last year.

56. More changes followed. On April 8, 2008, *The Wall Street Journal* reported:

> At Citigroup Inc., C. Michael Armstrong, former CEO of AT&T Corp., is expected to step down as chairman of the New York bank's audit and risk committee, according to people familiar with the situation. Mr. Armstrong, who had held the post since 2004, is relinquishing the post amid a push by the AFL-CIO and other institutional investors to oust him from Citigroup's board.
>
> Such critics claim that Mr. Armstrong, 69 years old, failed to adequately oversee the bank's risk-management processes and therefore is partly to blame for mistakes that have battered Citigroup in recent months.
>
> . . .
>
> At Citigroup, which has endured more than $20 billion in losses, some directors weren't aware of the company's exposure until huge write-downs started piling up, according to people familiar with the matter. Experts say that is a big failure.

57. Losses and write-downs continued to mount prior to the Class Period. In October of 2008, Citigroup announced its results for the third quarter of 2008. The Company reported yet another massive loss – $2.8 billion ($0.60 per share) after over $13 billion of credit losses,

reserves for bad loans and write-downs for mortgage-related securities. From the outset of the credit crisis until the end of the third quarter of 2008, Citigroup reported $61 billion of losses tied to the slumping housing market.

58. Faced with a meltdown in the financial services industry, Congress passed the Troubled Asset Relief Program ("TARP") in early October of 2008.

59. As reported by *The New York Times* on October 13, 2008, even though Citigroup was slated to receive $25 billion from the TARP fund, analysts remained highly skeptical that $25 billion would be anywhere near enough to save the Company, given the magnitude of the problems Citigroup faced:

> . . . The government investment only masks the longstanding problems inside the sprawling Citigroup empire, including a lot of worrisome assets.
>
> "They still have to sell the sofa and dining room furniture to make this month's rent," said Meredith Whitney, an analyst at Oppenheimer & Company. "They have all this junk on their books."
>
> Just how much junk will be the focus of investors on Thursday, when Citigroup will report what Ms. Whitney says will be "ugly" third-quarter results. Citigroup has already marked down the value of $22 billion of mortgage-linked securities on its balance sheet to 61 cents on the dollar -- a figure some analysts say they believe is still far too high.

60. Citigroup's third quarter 2008 results did nothing to reassure investors. As reported by the Associated Press on October 16, 2008:

> . . . Of the four major U.S. banks left standing - Citigroup, JPMorgan Chase & Co., Bank of America Corp. and Wells Fargo & Co. - Citi has been on the shakiest footing for a while. Its peers have managed to keep turning profits, albeit dampened ones, and they ve made acquisitions while Citi has shrunk.
>
> . . . .

> . . . Citi wrote down $4.4 billion in investments, plus another $612 million from a settlement related to auction-rate securities; recorded $4.9 billion in credit losses; and took a $3.9 billion charge to boost reserves. The bank has written down the value of investments tied to souring mortgages and other bad debt by some $51 billion since this time last year - the most of any other bank.

61. Furthermore, Citigroup's CFO, Gary Crittenden, reported that while he expected Citigroup's losses due to subprime mortgages to slow, losses tied to consumer loans, including credit cards, were likely to increase. However, as reported by *The Wall Street Journal* in an October 23, 2008 article, this assessment was likely not pessimistic enough:

> Banks relying on historical models were fooled when it came to potential mortgage hits. They similarly miscalculated with structured-debt products.
>
> Now, the same may hold true for credit cards. Banks and big card issuers have seen card losses climb and are projecting that things will worsen in 2009.
>
> But their expectations, largely grounded in the experience of past downturns, mightn't be dour enough. Losses could easily overtake historic peaks, possibly spelling additional woe for the likes of Citigroup . . . .
>
> A big reason: Credit-card usage has changed so drastically, even since the last downturn. A broader range of consumers now carry cards and many run consistent credit balances to fund their lifestyles. This has led to successively higher peaks over the years in credit-card charge-off rates.
>
> The danger is that the current financial downturn results in a new, far-higher peak charge-off rate that leads to unexpectedly large losses at banks and other card issuers. Each tick higher in the unemployment rate makes that more likely. Already, both delinquencies and the likelihood they turn into real losses are rising.

62. Citigroup announced that it had cut 23,000 jobs over the course of the year (2008), with 11,000 in the third quarter of 2008 alone. In addition, the Company closed retail

branches in Texas and Nevada, planned to sell its German retail arm, and announced it would continue cutting costs and reducing assets.

63. As a result of Citigroup's exceptionally poor performance, the Company's stock, which had traded as high as $56.41 in December of 2006, had dropped to $13.99 on November 3, 2008, losing approximately 75% of its value.

64. Thus, as of the beginning of the Class Period, Citigroup had lost billions of dollars each fiscal quarter for a year, had been forced to write off or take reserves for tens of billions of dollars of bad loans and worthless securities, was facing massive additional losses tied directly to its subprime mortgage-related business, and was facing an accelerating crisis in its consumer loan and credit card business as the economy worsened. By this time, it was abundantly clear that Citigroup could not continue to survive without a major restructuring and massive government aid. Indeed, it was clear that if Citigroup were to survive at all, it would be in a drastically different and diminished form. And it would have been clear to a reasonably prudent fiduciary that if Citigroup could continue to exist, which was very much in question, it would be as a dramatically different company subject to substantial government ownership and control, all of which would have resulted in a substantial dilution of the shares of Company stock and a catastrophic diminution in the value of Citigroup shares.

**Citigroup Was In Dire Circumstances Throughout the Class Period**

65. Throughout the Class Period, Defendants knew or should have known that Citigroup stock, and thus the Fund, was an imprudent retirement savings option for the Plan because: (a) Citigroup was not adequately capitalized; (b) the Company was overexposed to mortgage-related investments; (c) the Company was on the verge of bankruptcy; (d) the Company would ultimately require multiple bailouts by the federal government to prevent bankruptcy, and (e) the market price for Citigroup stock was substantially artificially inflated

because the facts about the Company's financial conditions and prospects were concealed from the investing public.

66. Regardless, upon information and belief, Defendants performed no investigation concerning the prudence of continuing to offer Citigroup Stock as a retirement savings option, or, alternatively, Defendants performed such an investigation but disregarded the results thereof. Had Defendants performed a reasonable and diligent investigation, they would have discovered that Citigroup was on the verge of collapse and in a "dire" situation.

67. An article that appeared in *The New York Times* on November 14, 2008, provides a snapshot of Citigroup's declining position and dire circumstances at the outset of the Class Period:

> After a year of red ink, a months-long plunge in its share price and a $25 billion government rescue, you might think the worst was over for Citigroup.
>
> It is probably not.
>
> Citigroup, which a decade ago set out to rewrite the rules of American finance, is bracing for still more pain now that a recession is at hand. Loans that the financial giant made to consumers in good times are going bad in growing numbers. For the moment, profits seem as elusive as ever, analysts say.
>
> Once the most valuable financial company in America, Citigroup is withering along with its share price, which this week sank into single digits for the first time in a dozen years. The company is also shrinking in another painful way: by cutting, and cutting, and cutting jobs. Another round of pink slips is expected next week.
>
> As Vikram S. Pandit completes his first year as chief executive, many analysts say Citigroup has lost its way. Insiders say the company is racked by office politics at a critical moment in its history.
>
> Mr. Pandit is struggling to regain his grip on the company, which operates in scores of countries, after his attempt to buy Wachovia was upended by Wells Fargo. That misstep left Citigroup grasping

> for a new strategy to lure deposits and build up its branch network in the United States.
>
> ***"Citi doesn't have a credible management team, they don't have a credible board,"said Christopher Whalen, managing partner at Institutional Risk Analytics. "If you look at their loss rate, it is almost inevitable that Citi is going to be asking the government for more money next year."***
>
> Worries about Citigroup's future were apparent in the stock market on Thursday. While the share prices of many of its rivals soared along with the broader market in a stunning afternoon rally, Citigroup's stock fell nearly 2 percent by the end of regular trading. At its closing price of $9.45, the stock has lost almost 68 percent this year, making it the third-biggest loser in the Dow Jones industrial average, behind Alcoa and General Motors.

(emphasis added)

68. Just days later, as reported by the *Business Press* on November 17, 2008, "Citigroup, widely seen as the sickest Wall Street Bank, will make some of the most severe cuts in the history of U.S. business – 53,000 jobs - as it tries to slash costs and get back to basics before it's too late. . . . Challenger, Gray& Christmas, Inc., which has tracked downsizing since 1993, said Citi's cuts are the second-most on record." The article also focused on the structural changes Citi planned to make just to survive in a different and sharply diminished form:

> About half the cuts are expected to come from selling off parts of the business. The bank has already said it would sell Citi Global Services and its German retail banking businesses, and it plans to unload more, a spokesman said. The rest of the cuts are expected to come from layoffs and attrition.
>
> . . .
>
> And if the bank takes more hits due the worsening credit climate - not only in mortgages, but other consumer debt like credit cards - it might have to keep cutting costs further.
>
> ***"Of the big banks, Citi is the sickest dog,"*** [Robert Howell, a finance professor at Dartmouth's Tuck School of Business, said.]

> Of the big four U.S. banks, a group that also includes JPMorgan Chase & Co., Bank of America and Wells Fargo & Co., Citi is the only one that has not made a recent major acquisition - which analysts say is one of the few chances for growth right now. Citi is also the only big bank left that has posted four straight quarterly losses.

(emphasis added)

69. A Deutsche Bank AG analyst responded to the November 17, 2008 layoff announcement by reducing his share-price estimate for the stock by 44 percent, forecasting that the bank might post a loss of 30 cents per share in 2009 rather than the previously-projected $1.50 per share net income. As reported by *Bloomberg News* on November 18, 2008:

> Citigroup Inc., the fourth-largest U.S. bank, dropped to the lowest in almost 13 years in New York trading after Deutsche Bank AG analyst Mike Mayo said the company may report a loss for 2009.
>
> . . .
>
> The bank has lost money in each of the past four quarters as bad loans increased and demand for banking services declined. Analysts surveyed by Bloomberg expect another deficit for the final quarter of 2008.
>
> "Citi's news that it is cutting 50,000 jobs shows it is taking tough actions, but it still is not likely enough to offset declining revenues and higher credit costs," Mayo wrote in a note to clients today.

70. The November 2008 analysts' assessment of Citigroup, however, contrasted starkly with what Citigroup was telling its own employees, including the Participants. On November 17, 2008, Citigroup circulated an internal e-mail to its employees stating:

> November 17, 2008
>
> Dear Citi Colleagues,
>
> A few minutes ago I concluded a Town Hall meeting in New York. I shared with you what I shared with the Senior Leadership Committee last week, and you'll be hearing more about it from the leaders of your organizations in the coming days.
>
> There are a few points that I would like to reiterate:

> - All of you have done an outstanding job in the last 11 months - ***we are in a far stronger position going into 2009 than we were going into 2008. And we are even better positioned for 2010.***
>
> ***- Our underlying business remains strong and revenues have been stable.***
>
> - We have shrunk our balance sheet and sold businesses consistent with our strategy. We will continue with these efforts.
>
> - We have been very successful at bringing our expenses down. 2009 expenses are expected to be between $50 and $52 billion, down almost 20 percent from peak levels. We expect headcount to be down 20 percent in the near term from the peak of 375,000 at year-end 2007.
>
> ***- We have significantly reduced our risky assets while putting the company in a very strong capital position. Our new risk management organization is much stronger.***
>
> - We have spent the last year "getting fit," are more streamlined, and are in a strong competitive position to take advantage of future opportunities. ***We will be the long-term winner in the industry.***
>
> The coming year could be a difficult one for our clients and customers. Citi needs you to maintain your focus on helping them succeed because now is the time when lasting loyalty is earned.
>
> And in return you can have confidence that I and the Citi leadership team will stay focused on strengthening Citi and positioning all of us to benefit when conditions inevitably improve.
>
> Vikram [Pandit]
>
> (bjh) NY

(emphasis added)

71. On November 20, 2008, the Wall Street Journal reported that Citigroup had scheduled a board meeting for the following Friday and was considering selling off pieces of the bank or even the whole company. As reported by AP news on November 21, 2008, Citi's share price continued to tumble to their lowest level in more than 15 years, having "shed 60 percent of their value since last Friday." The article noted further that "[c]oncerns are growing that the

deteriorating economy will slam Citigroup with more write downs in the coming quarters. What began as a subprime residential mortgage crisis has ballooned into a full-blown debt crisis, escalating defaults in everything from leveraged loans to credit card debt to commercial real estate loans."

72. As the Office of the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") has written, things at Citigroup became even worse after November 3, 2008:

> According to an FRBNY official, by November 21, 2008, counterparties began to "pull back from Citigroup" because of its perceived decline in creditworthiness. This meant, as he described it, that Citigroup's counterparties were increasingly unwilling to engage in financial transactions with Citigroup or to provide it with credit. These included federal funds [Federal funds are unsecured loans (loans without collateral) of reserve balances at Federal Reserve Banks between depository institutions. The most common duration or term for a federal funds transaction is overnight, although longer-term deals are arranged.] market counterparties (other depository institutions that would normally extend Citigroup credit in overnight borrowing) and, even more troubling, secured financing counterparties. The FRBNY official described short-term funding through secured financing as a "good liquidity barometer." Liquidity is the degree to which an asset can be easily converted to cash.
>
> An FRBNY official told SIGTARP that it was "a bad sign" when lenders started to differentiate Citigroup's collateral from its peers or declined short-term funding for Citigroup. Another FRBNY official stated that it was clear the market was singling out Citigroup, a s its peers were not experiencing the same problems. Citigroup was also having difficulty issuing commercial paper. A former Citigroup Treasurer told SIGTARP that it became hard for Citigroup to finance commercial paper for any length of time beyond overnight but stated that it was not an important avenue of liquidity. FRBNY officials told SIGTARP that commercial paper purchasers such as mutual funds lost confidence in Citigroup's ability to repay, which forced Citigroup to issue debt with shorter maturities.

73. By the next day, as reported by *The New York Times* on November 22, 2008, Citigroup was back in talks with the federal government on how to rescue the company from its dire circumstances:

> With the sharp stock-market decline for Citigroup rapidly becoming a full-blown crisis of confidence, the company's executives on Friday entered into talks with federal officials about how to stabilize the struggling financial giant.
>
> In a series of tense meetings and telephone calls, the executives and officials weighed several options, including whether to replace Citigroup's chief executive, Vikram S. Pandit, or sell all or part of the company.
>
> Other options discussed included a public endorsement from the government or a new financial lifeline, people involved in the talks said.
>
> The course of action, however, remained uncertain on Friday night, these people said, and other options may yet emerge. But after a year of gaping losses and an accelerating decline in share price, Citigroup, which has $2 trillion in assets and operations in scores of countries, is running out of time, analysts said.
>
> After a board meeting early Friday morning, Citigroup's management and some board members held several calls with Henry M. Paulson Jr., the Treasury secretary, and with the president of the Federal Reserve Bank of New York, Timothy F. Geithner, who later emerged as President-elect Barack Obama's choice to be Treasury secretary.
>
> As Citigroup's stock sank during the day, falling 68 cents to close at $3.87, the Federal Reserve was carefully monitoring how much money corporations and other customers were withdrawing from the bank, people involved in the discussions said.
>
> The Fed was trying to ascertain whether the tumult in the stock market could escalate into something worse.
>
> [David M. Walker, the president of the Peter G. Peterson Foundation and a former United States comptroller general] said that the government should be concerned about Citigroup only if there were a run on the bank that threatened the financial system. The government should not, he said, be concerned about shareholders.

> Some executives, however, argued that it was important to protect Citigroup's shareholders because if they lose their investment, that will send other bank stocks diving.
>
> Among the other ideas being bandied about Washington and the halls of Citigroup would be an assisted merger between Citigroup and another major bank. The merger might be structured with government assistance based on the blueprint that was developed for the Wachovia and Citigroup merger.
>
> . . .
>
> That structure could be used in a merger, but this time around, the government would be absorbing losses on Citigroup's loans. But it remains unclear what other bank is in a strong enough position to merge with Citigroup.

74. After meetings that lasted through the weekend, the government announced a second bailout for Citigroup on Sunday, November 23, 2008. Under the agreement, the government agreed to provide an additional $20 billion in cash and guarantee a total of $306 billion of Citigroup's assets against losses greater than $29 billion. In exchange, Citigroup agreed to issue the government $7 billion worth of preferred stock which had preference over Fund shares.

75. The SIGTARP report shows just how dire the situation at Citigroup was. FDIC Chairman Sheila Bair is quoted as having said, at the November 23, 2008 meeting: "We were on the verge of having to close this institution ***because it can't meet its liquidity Monday morning***. They have $500 billion in foreign deposits that nobody can guarantee." (emphasis added) Similarly, another FDIC official is quoted as having said, at the same meeting, "[t]he risk profile of Citibank is increasing rapidly due to the market's lack of confidence in the company and the substantially weakened liquidity position. Without substantial Government intervention that results in a positive market perception on Monday morning, ***OCC and Citigroup project that Citibank will be unable to pay obligations or meet expected deposit outflows next week."***

(emphasis added). The report adds that "[i]n the view of Secretary Paulson, the company was ***teetering on the brink of failure***. The company's ***survival was in doubt***, and the Government, through TARP and other means, stepped in to save [it]." (emphasis added)

76. In short, in November of 2008, Citigroup was faced with a take-it-or-leave-it government demand, without which it would have been bankrupted within days. The SIGTARP report also outlines a number of "critical events" stretching months back, which the Plan's fiduciaries were or should have been aware of.

77. Even this massive bailout was not viewed as sufficient for Citigroup's survival. As reported in *American Banker* on November 25, 2008:

> The government lifeline announced Sunday night gave Citigroup Inc. a critical reprieve after a week in which investors pummeled the New York company's stock.
>
> But observers say funneling another chunk of taxpayer-backed capital to Citi does not alter its fundamental issues, like the need to revamp itself, possibly through rapid growth in domestic deposits or a foreign downsizing.
>
> The consensus is that the government stepped in because it viewed Citi as "too big to fail." But its size may become less of an issue if, as some observers predict, the government requires the divesting of certain operations, as it did in its recent American International Group Inc. rescue.
>
> "If I were in charge there, I'd be breaking up that company," Bart Narter, senior vice president of the banking group at Celent, a consulting unit of Marsh & McLennan Cos., said in an interview Monday. "I think it's clear now that has to be done."
>
> . . .
>
> Even with acquisitions, Christopher Whalen, managing director at Lord, Whalen LLC's Institutional Risk Analytics, said in an interview that domestic growth alone will not be enough to return Citi to profitability. The company, which has divested about $100 billion of the $400 billion it has pledged to divest by 2012, needs to sell off vast chunks of its foreign business, from Asia to Europe,

> and start over as "a domestic bank" that is "about half its current size."
>
> The pressing issue for Citi is not simply toxic legacy assets, Mr. Whalen said; it's also a matter of why Citi delved so deep into risky investments and lending in the first place. The global model has been too vast to manage all the various parts effectively, he said, forcing Citi in recent years to take big risks on exotic mortgages and securities to prop up its bottom line.
>
> "The model is broken," Mr. Whalen said. "The only way to bring to the Street what investors thought they were entitled to was to do a range of stupid things."

78. In a November 24, 2008 research note, Meredith Whitney, an analyst for Oppenheimer & Co., stated: "We are still cautious on the potential future dilution from further prospective capital raises for the group as well as continued higher losses related to credit and asset deflation," indicating that Citigroup still had around $120 billion in "risky assets" and reiterating her "underperform" rating. Two days later, in an interview with *Bloomberg News*, Whitney said that the massive new federal government cash injections at Citigroup would just "plug holes" in the balance sheet:

> Every single financial is carrying what I call junk in the trunk, assets that they would rather not have, because they made loans at inflated prices, at really reduced rates. So, they're not making money on these assets, and in every case, across the board, they're carrying assets at inflated levels.
>
> So, what goes into the $29 billion for Citi is - the markets fell out of bed in October and November. And so you're just going to have writedowns on the carrying values of these assets. Further, you have reserve builds that you've got to build into the system. And then finally. . . [i]n '09, you're going to take off-balance sheet assets back on balance sheet. Collectively for Citi, JPMorgan - and Citi, JPMorgan, Bank of America, that's $25 billion of up front capital that they're going to have to put towards these reserve builds. So it goes fast. And I think that all of these institutions will be back with their hands out, either to private equity or - what I mean private equity, individual investors or public, the government.

79. An AP article published the same day (November 24, 2008) stated that "Taxpayers may be wondering why they're forking over more money to rescue yet another behemoth, Citigroup, even as their own nest eggs crack and jobs evaporate." The article went on to state that the taxpayer investment was a huge gamble because the risks were so high:

> Whether the government's rescue of Citigroup Inc., announced late Sunday, will ultimately prove a good deal for taxpayers is hard to tell. In part, that's because no one seems sure what Citi's troubled assets are actually worth.
>
> If the gamble pays off, Citigroup would be back on firm footing, unhinged financial markets would recover and taxpayers would turn a profit. If it doesn't, taxpayers would take a hit. And they would possibly have to rescue still more huge financial institutions, digging the bailout hole even deeper.
>
> "It is way too early in this crisis to say whether it is a winner or a loser," said Cornelius Hurley, a professor and director of the graduate program in banking and financial law at Boston University. "I don't know if I am exhilarated by the prospect of being a shareholder in Citi or AIG. I'd rather have the money in my 401(k)."
>
> . . .
>
> Under the loss-sharing arrangement, Citigroup Inc. will assume the first $29 billion in losses on the risky pool of assets, which stays on its books. Beyond that amount, the government would absorb 90 percent of the remaining losses and Citigroup 10 percent. Money from the $700 billion bailout and funds from the FDIC would cover the government's portion of potential losses. The Federal Reserve would finance the remaining assets with a loan to Citigroup.
>
> In exchange for the guarantees, the government will get $7 billion in preferred shares of Citigroup.
>
> As a condition of the rescue, Citigroup cannot pay quarterly dividends to shareholders of more than 1 cent a share for three years unless it obtains consent from the three federal agencies. The bank is now paying a dividend of 16 cents, halved from a 32-cent payout in the previous quarter.

80. *Bloomberg News*' report on the second Citi bailout similarly stressed that the deal was necessary to Citi's survival:

> Citigroup Inc., facing the threat of a breakup or sale, received $306 billion of U.S. government guarantees for troubled mortgages and toxic assets to stabilize the bank after its stock fell 60 percent last week.
>
> . . .
>
> . . . The decision came after New York-based Citigroup's tumbling share price sparked concern that depositors might pull their money and destabilize the company, which has $2 trillion of assets and operations in more than 100 countries.
>
> "It really was a must-do thing," said Nader Naeimi, a Sydney-based strategist at AMP Capital Investors, which manages about $85 billion. "If they'd let Citigroup go, that would've been disastrous."
>
> . . .
>
> Citigroup shareholders will be diluted in the "near term by the cost of the incremental preferred stock," Morgan Stanley analysts Betsy Graseck and Cheryl Pate wrote in a report today. . . .

81. The November 24, 2008 *Bloomberg News* article noted the similarities between what happened at Citigroup and the last days of Bear Stearns and Lehman Brothers:

> Citigroup also issued a statement last week saying the company had "a very strong capital and liquidity position and a unique global franchise," and ***Pandit held two conference calls with employees to reassure them.***
>
> The stock kept plunging, forcing the bank's board to hold an emergency meeting on Nov. 21 and thrusting executives into a weekend of discussions with the Fed and Treasury. The slump was reminiscent of what happened to Bear Stearns Cos. in March before it was sold to JPMorgan Chase & Co. and to Lehman Brothers Holdings Inc. before it went bankrupt in September.
>
> ***"Pretending that Citi is going to be a going concern I think is silly,"*** Christopher Whalen of Institutional Risk Analytics, a Torrance, California-based research firm, said in a Bloomberg Radio interview. "We should be thinking about breaking this company up and redistributing the assets into stronger hands."

(emphasis added)

82. Whalen's call for the breakup of Citigroup in the wake of the government bailouts was echoed by other analysts and investors. As reported in *Bloomberg News* on November 25, 2008, HSBC Holdings Plc. Chairman Stephen Green said his firm would consider buying the "right" assets from Citigroup, and Jim Rogers, Chairman of Rogers Holdings, argued that "[t]he way this system is supposed to work, people fail, and then the competent people take over the assets from the failed people and start again with a new, stronger base."

83. *The Wall Street Journal* stressed that the "sweeping rescue plan underscores how concerned the government had become about letting Citigroup's fortunes continue to deteriorate. The Company had been pounded by mortgage-related losses and is on track to suffer further from the weakening economies in the U.S. and around the world." A November 24, 2008 *The Wall Street Journal* article noted that "the U.S. government seems to have decided it can't afford to gamble on whether Citigroup will weather the storm," and analyzed the magnitude of the problems at the Company:

> In addition to $2 trillion in assets Citigroup has on its balance sheet, it has another $1.23 trillion in entities that aren't reflected there. Some of those assets are tied to mortgages, and investors have worried they could cause heavy losses if they are brought back on the company's books.
>
> The assets affected under the government plan are largely loans and securities backed by residential and commercial real estate. Such assets have been devastated by the crisis in the housing markets and have started coming under greater strain in recent weeks as the U.S. economy slows.
>
> . . .
>
> On Sunday evening, government officials were locked in meetings to hammer out the final terms of an arrangement that will leave the government deeply enmeshed in the inner workings of one of the world's largest financial institutions.

> . . .
>
> Despite the unprecedented scope of the rescue plan, it isn't clear whether it will be enough to stabilize Citigroup. The roughly $300 billion pool of assets that are included in the rescue plan represent only a sliver of the company's more than $3 trillion in assets, including its holdings in off-balance-sheet entities.
>
> Jitters about such "hidden" assets helped trigger the nose dive in Citigroup's stock last week. Among the off-balance-sheet assets are $667 billion in mortgage-related securities.
>
> . . .
>
> As recently as one month ago, Citigroup had hoped to be able to unload some of those assets to the U.S. government through its Troubled Asset Relief Program, according to people familiar with the bank's plans. But when Treasury Secretary Henry Paulson this month shelved plans to use TARP to purchase banks' bad assets, that option vanished.
>
> Last Monday, Mr. Pandit said in a meeting with employees that Citigroup was scrapping plans to try to sell about $80 billion in risky assets. Investors and analysts interpreted the move as a sign that Citigroup either was unable to sell the assets, or would have had to incur hefty losses in the process.
>
> Two days later, Citigroup announced it was buying $17.4 billion in assets from its structured-investment vehicles -- complex entities whose holdings included risky mortgage-linked securities -- and faced a $1.1 billion loss due to their diminished values.
>
> The back-to-back moves, coupled with existing fears about Citigroup's off-balance-sheet holdings, stoked investor fears that Citigroup could be swamped by toxic assets flooding back onto its books. That helped ignite the current panic, which was exacerbated by a drumbeat of bleak economic news.

84. The result of the government's bailout was - as might be expected – substantial government intervention in the management of the bank. As reported in *Bloomberg News* on December 17, 2008:

> Regulators had been increasingly concerned about Citigroup's financial situation in recent months and after last month's second cash injection, which left the Treasury as the company's largest investor with a 7.8 percent stake, oversight was tightened. . . .

> The regulators - the Federal Reserve and the Office of the Comptroller of the Currency - expect to have power of veto over strategy decisions, although both have stopped short of seeking formal orders that would allow them to intervene. . . .
>
> When Citigroup pulled out of talks to acquire Chevy Chase Bank of Bethesda, Maryland it was because they expected an OCC veto, rather than the slump in Citigroup's share price. . . .

85. By the beginning of January, 2009, analysts such as Deutsche Bank AG's Mike Mayo were again lowering their earnings estimates for Citibank. Mayo argued that "worsening economic trends should put pressure on Citigroup's loan portfolios," especially for credit cards, U.S. residential and commercial mortgages and international consumer banking.

86. On January 13, 2009 as many had been predicting, Citigroup announced that it was reducing itself dramatically and would, therefore, be a shadow of its former self. In particular, Citigroup announced that it would give up over half of its Smith Barney retail brokerage business to a joint venture with Morgan Stanley. Moreover, *Bloomberg News* reported that Citigroup contemplated the sale of its entire CitiFinancial consumer lending unit. As reported in *Associated Press* the next day, this was the end of Citigroup as it had previously existed:

> The original financial supermarket is dead.
>
> Citigroup signaled the end of a decade-long experiment to create one-stop shopping for financial services everything from consumer loans to investment banking with Tuesday's announcement that it was putting its Smith Barney brokerage into a joint venture with Morgan Stanley.
>
> The deal, which will give Citigroup $2.7 billion in badly needed cash as it gives up control of Smith Barney, comes as the company still struggles in the aftermath of the mortgage and credit crisis. There is speculation that CEO Vikram Pandit, who for months supported Citigroup as a "universal bank," will be taking further steps to simplify and streamline the company.

> Citi could soon shrink itself by one-third, according to a Wall Street Journal report Wednesday. The Journal says Citi is likely to announce plans next week to shed two consumer-finance units, the bank's private-label credit card business and cut back on trading it does on its own behalf.
>
> And many people on Wall Street believe Citigroup could be headed for an even larger-scale dismantling if the federal government which now has a stake in Citi thanks to its recent bailout has its way.
>
> ***"I think within 12 months, Citigroup no longer exists,"*** said William Smith at Smith Asset Management, who owns Citigroup shares. He has been calling for a breakup of Citigroup for years, and believes the government will force that fate in piecemeal fashion over the coming year.
>
> . . .
>
> Citigroup and Morgan Stanley plan to combine Citi's brokerage, Smith Barney, with Morgan Stanley's wealth management business.
>
> The capital from the Morgan Stanley deal, however, is likely not enough to make up for upcoming losses. And if the government decides it does not want to continue propping up banks like Citigroup, its dismantling could accelerate.
>
> The new administration could "come to the realization that the whole economy does not hinge on the banks," said Octavio Marenzi, head of financial consultancy Celent. "Banking is important. The banks themselves are not."

(emphasis added)

87. On January 16, 2009, Citigroup reported still more massive losses for the fourth quarter of 2008: 8.29 billion in losses, or $1.72 per share. As reported in *Bloomberg News* on the same day, "[e]xcluding a $3.9 billion gain from the sale of a German consumer bank and other results from discontinued operations, the bank's loss was $2.44 a share. On that basis, the loss was more than twice as much as the $1.08 average estimate of analysts in a Bloomberg survey."

88. Market reaction to the Company's January 16, 2009 announcement quickly turned negative, as reported in *Bloomberg News* on January 17, 2009:

> ***Citigroup Inc. shareholders aren't buying Vikram Pandit's attempt to salvage the bank by splitting it in two.***
>
> Citigroup shares tumbled to a 16-year low on Jan. 16 after Pandit, the U.S. bank's 52-year-old chief executive officer, said he would undo a decade of acquisitions by separating the bank into two units, Citicorp and Citi Holdings.
>
> The problem: Nothing -- not $45 billion of U.S. government funds, not federal guarantees on $301 billion of debt, not a pledge to dump non-core assets -- can stave off the worst financial crisis since the Great Depression. Already crippled by trading losses on mortgage bonds, the bank faces credit-card losses that surged to a record in the fourth quarter.
>
> "The losses from the investment banking businesses wiped out any margin for error that Citi might have had to be able to weather the storm of the U.S. consumer defaulting on his debts," said James Ellman, president of San Francisco-based money manager Seacliff Capital LLC.
>
> After initially rallying 17 percent yesterday on news of Pandit's planned reorganization, Citigroup shares fell, closing down almost 9 percent at $3.50. At that level, it's below the $3.77 it dropped to on Nov. 21, when the bank entered talks with officials from the U.S. Treasury Department and Federal Reserve over a second round of rescue funds.
>
> . . .
>
> Analysts aren't speculating -- as they were in November -- that nervous depositors might pull out their savings and erode the money Citigroup uses to fund its operations. Total deposits stood at $774 billion at the end of December, little changed from the end of September, Citigroup said.
>
> The government's $52 billion of preferred stock in Citigroup provides a cushion for depositors, who would stand to get paid off before the government in an insolvency. ***Common shareholders, whose interests are junior to the government's, don't get the same comfort.***
>
> . . .

> Another round of government intervention would probably take the form of an American International Group Inc.-style nationalization, NYU's Smith said. Pandit and board members probably would lose their jobs and ***the government would try to "stop the bleeding without too much regard for saving the business model or future shareholder value for that matter,"*** he said.
>
> Citigroup has racked up $28.5 billion of net losses over the past five quarters, or an average of $5.7 billion per quarter. At that rate, the bank's tangible common equity won't last long.
>
> "The next six months will determine if there is anything left," said Smith Asset Management CEO Bill Smith, who has repeatedly called for a breakup.
>
> With the stock at $3.50, there's little left to lose.

(emphasis added)

89. As Citigroup continued to whither because of its dire circumstances, *Bloomberg News* again reported on Citigroup divestment announcements:

> As Citigroup plunged 77 percent last year in New York trading, the bank was forced to accept $45 billion of U.S. government rescue funds. Chief Executive Officer Vikram Pandit agreed this week to cede control of the Smith Barney brokerage to Morgan Stanley. He also said today he plans to sell the CitiFinancial consumer-lending unit and Tokyo-based Nikko Asset Management Co., after hiving them off in a new unit called Citi Holdings.
>
> "We view the divestiture of Smith Barney as a signal that conditions have materially weakened even from the lousy conditions that prevailed in late 2008," CreditSights Inc. analyst David Hendler wrote in a Jan. 14 note to clients.
>
> Citigroup fell 15 percent yesterday to $3.83 in New York Stock Exchange composite trading, partly on speculation the bank's shareholders may suffer if Citigroup has to seek more government money. Spokesman Mike Hanretta declined to comment on whether the bank is in discussions over an additional infusion.
>
> . . .
>
> A dwindling capital cushion and sinking stock price forced the 52-year-old Pandit to abandon Citigroup's decade-old strategy of providing investment advice alongside branch banking, stock

underwriting and corporate lending. He's shedding units to free up capital and save the bank from insolvency.

"They are going to try to home in on what's worth something, and try and sell the pieces that they really can't value," Todd Colvin, vice president of MF Global Inc., said in a Bloomberg TV interview.

The bank also said its Primerica Financial Services, a Duluth, Georgia-based life insurance company, will no longer be considered among "core" operations, which include banking, securities underwriting, corporate lending and payment- processing businesses.

. . .

The plan to cut off "non-core" businesses in a deteriorating economy may put the bank into a deeper hole, Sanford C. Bernstein & Co. analyst John McDonald wrote in a Jan. 14 report.

"It will likely be difficult for Citi to effectively dispose of assets and businesses in the current environment," McDonald wrote. "Any new solution is likely to need an incremental infusion of common equity, either from the government, private investors or the public markets, any of which is likely to be dilutive to existing Citi shareholders."

90. Reacting to Citigroup's announcement, the *Evening Standard* (London) reported on January 16, 2009:

AILING US banking giant Citigroup today unveiled a worse than expected $8.29 billion (£5.5 billion) loss for the fourth quarter amid speculation the ***US government could be forced to undertake full-scale nationalisation.***

. . .

Bank insiders suggested today that full-scale nationalisation is unlikely, but some traders warned it may be the only option.

Manoj Ladwa, derivatives broker at ETX Capital in London, said: "There is only so much money the US government can carry on pumping into US banks.

(emphasis added)

91. Other analysts, as well, were predicting that the steps being taken would be insufficient to save even the remnant that remained of Citigroup. Christopher Whalen from Institutional Risk Analytics, in an interview with *Bloomberg News* on January 16, 2009, stated that he saw the bank's divestiture plans as steps towards bankruptcy:

> ***I think that [bankruptcy] will probably be the end game.*** What we have now is open bank assistance, where the Fed and the Treasury are supporting the publicly listed holding company that we know as Citigroup.
>
> But in most cases, when you have a bank that's in this much trouble, they resolve it. In other words, they take the bank's subsidiaries, the FDIC does, acting as receiver, and the remaining company is forced to file bankruptcy.
>
> This is what happened with Washington Mutual. The bank was taken, it's reconstituted in a corporation, by the way, and it was then sold to JPMorgan, and it has no legacy liabilities, incidentally.
>
> . . .
>
> But Citi is too big, obviously, to put into a filing right now. So they're going to manage it. They're going to sell, especially the off-shore assets. Because a lot of these banking businesses around the world are portable, they're standalone entities.
>
> And then, I think by the time we get to the summer, what's left is probably going to be resolved. So I've been telling a lot of my clients; ***I don't assign any value to the common [stock] or the preferred [stock] at this point.***

(emphasis added)

92. Continuing concern over Citigroup's ability to survive drove its stock price ever lower over the month following the January 16, 2009 announcement of its fourth quarter results and divestment plans. On February 20, 2009 Citigroup stock fell 48 cents - 19 percent of its then-present value – to $2.03. As reported in *Bloomberg News*, the decline was based on concern over the possibility that the government would have to take over the bank. Senator Christopher Dodd, then Chairman of the Senate Finance Committee, stated in an interview that nationalization was

possible for "a short time." Although others doubted that nationalization would be necessary, as Bloomberg reported, ***"'Everyone thinks that the common and preferred of Citi . . . [is] going to* be wiped *out,'"*** quoting William Smith of Smith Asset Management in New York (emphasis added)

93. On February 27, 2009, the government announced yet another bailout of Citigroup. As reported in *The New York Times* on February 28, 2009:

> By any measure, the federal government's latest rescue for Citigroup is perhaps the most daring attempt yet to stabilize the nation's beleaguered banks.
>
> But it almost certainly won't be the last. No sooner did the Treasury Department announce on Friday that it would increase its ownership in Citigroup than the questions began to swirl.
>
> The big question, of course, is this: Will this plan, the third since October, be the one that finally works? Will it shore up this $2 trillion behemoth? Or is the outcome that the banks and the government are so desperately trying to avoid -- nationalization, under whatever guise -- only a matter of time?
>
> Wall Street's judgment was swift and brutal. Citigroup's share price, which a little over two years ago was flying high at $55, plunged 96 cents to a mere $1.50. Other banking shares also fell hard, underscoring the acute anxiety over where this will end and what the government will do next.
>
> The latest Citigroup rescue, experts said, falls short on several fronts. Neither the previous bailouts nor this one, which will increase the government's ownership in Citigroup to 36 percent from 8 percent, removed the toxic assets that are at the heart of Citigroup's problems. At best, this third rescue may buy time to devise a solution that allays investors' fears. At worst, it could allow the problems to fester and eventually cost the government -- and, by extension, taxpayers -- even more money.
>
> . . . .
>
> With the first two bailouts, the ***government provided Citigroup with $45 billion. With the third -- which won't involve additional taxpayer dollars -- it will become Citigroup's largest shareholder by far.***

> ***Yet Citigroup could still require vast amounts of added capital.*** It must cope with an expected wave of losses this year on all kinds of loans as the recession deepens. For the moment, it may simply muddle along.
>
> . . .
>
> . . . [Pandit] said the bank was committed to its remaining businesses and tried to quash the perception that the government's influence would expand.
>
> "We are going to run Citi for shareholders," Mr. Pandit said in a conference call.
>
> Investors -- and even Citigroup's own employees -- have their doubts. ***Stockholders' investments will be severely diluted.*** And many analysts say they believe the rescue, which will allow the government to convert more shares over time, slowly increasing its stake, amounts to an intravenous drip that is keeping the bank alive.
>
> But Citigroup's core problem -- tens of billions of dollars of toxic assets -- remains. So the government may need to convert more preferred stock, or inject more money directly.

(emphasis added)

94. On March 2, 2009, *American Banker* published a report indicating there was little hope that the Company would return to profitability in the first quarter of 2009. Reporting on a recent conference call with investors, the report stated, "[d]uring the call both Mr. Crittenden and Vikram Pandit, Citi's chief executive talked about their desire to return to profitability, but neither one laid out a concrete road map for getting there. . . . Mr. Pandit said: 'In the end, our business is about confidence.' Investors seemed anything but confident Friday, sending Citi's shares down 39%, or 96 cents a share, to $1.50."

95. By March 5, 2009, Citigroup shares dropped below $1.00 per share. As reported by the AP:

> Shares of Citigroup Inc., once the nation's most powerful bank, fell below $1 a share Thursday.

> The stock fell as low as 97 cents in late morning trading. It was down 11 cents, or 9.7 percent, to close at $1.02 in Thursday trading.
>
> . . .
>
> Ordinarily, an NYSE-listed company's shares cannot remain below $1 for more than 30 consecutive days. If that happens, the company gets about six months to prove to the NYSE it can boost its stock price.
>
> Citigroup used to be not only the largest bank by assets, but also by market capitalization, which has now been decimated by the stock's decline. At the start of 2007, its market cap was riding high at around $270 billion. But by March 2008, it had fallen below the $100 billion mark. Now, it's at $6.2 billion.
>
> As the recession deepens, the problems facing Citigroup souring loans and the impact of the recession are only getting worse.
>
> On Friday, the government agreed to exchange up to $25 billion in emergency bailout money given to Citigroup for as much as a 36 percent equity stake in the company. The government, along with other private investors, will convert some of their $45 billion in preferred stock into common shares. ***If the maximum amount of preferred stock is converted, current common stockholders will see their ownership stake fall to about 26 percent.***
>
> The deal between the Treasury Department and the bank is the third rescue effort in the past six months.
>
> The problem is the market knows Citigroup received no new capital last week. The conversion to common stock will create a wider equity base aimed at keeping investors calm as the economy deteriorates but Citigroup still has $45 billion in Troubled Assets Relief Program funding, the same amount as it did before. The switch to common stock will help boost Citigroup 's "tangible common equity," Wall Street's and Washington's new favored gauge of banks' health.
>
> . . .
>
> Citigroup, which hasn't turned a profit since the fall of 2007, will face its next test in April when it reports first-quarter earnings.

(emphasis added)

96. Although, in hindsight, Citigroup survived the Class Period, it did so only in a greatly reduced form, and only with multiple government bailouts and a partial government take-over which left the original shareholders— including all the Participants—owning a substantially smaller portion of a substantially smaller, different and less valuable company. Throughout the Class Period, Citigroup's survival was at risk, as attested by the numerous taxpayer bailouts and the statements of numerous analysts and experts, as set forth above. Its circumstances were dire, and it was an imprudent investment for retirement plan assets. This was particularly true of the Plan, the purpose of which was to provide for retirement savings as alleged above.

97. Additionally, since the end of the Class Period it has been reported that Citigroup had trimmed debt to obscure risks in shareholder reports during the Class Period. In a May 26, 2010 article entitled "Still Broken: Banks Trim Debt, Obscuring Risks" *The Wall Street Journal* reported that:

> Three big banks -- Bank of America Corp., Deutsche Bank AG and Citigroup Inc. -- are among the most active at temporarily shedding debt just before reporting their finances to the public, a Wall Street Journal analysis shows.
>
> The practice, known as end-of-quarter "window dressing" on Wall Street, suggests that the banks are carrying more risk most of the time than their investors or customers can easily see. This activity has accelerated since 2008, when the financial crisis brought actions like these under greater scrutiny, according to the analysis.
>
> The Journal reported last month that 18 large banks, as a group, had routinely reduced their short-term borrowings in this way. The new analysis looks at individual banks.
>
> ***Over the past 10 quarters, the three banks have lowered their net borrowings in the "repurchase," or repo, market by an average of 41% at the ends of the quarters***, compared with their average net repo borrowings for the entire quarter, according to an analysis of Federal Reserve data. Once a new quarter begins, they boost those levels.

> The banks' overall "leverage" -- that is, their use of borrowed funds to boost returns -- frequently has declined at the end of quarterly periods as well, the analysis shows.
>
> The data suggest "conscious balance-sheet management," said Robert Willens, an accounting specialist who heads Robert Willens LLC. If there are big gaps between average quarterly and quarter-end data, he said, ***the quarter-end numbers "are at best meaningless and at worst misleading and disingenuous."***
>
> . . .
>
> A Citigroup spokesman declined to comment, as did a Federal Reserve spokeswoman.
>
> Financial institutions have become sensitive about showing high levels of risk on their books, as the financial crisis has led investors and regulators to focus on some firms' levels of borrowing and risk-taking.
>
> Bank of America, Deutsche Bank and Citigroup account for about one-quarter of all repo borrowings by the 18-firm group of primary dealers. The three stand out among banks examined in the new analysis because they showed the most consistent, repeated pattern of quarter-end declines in repo debt from average levels for the same quarters.
>
> For this recent examination, the Journal looked at eight of the 18 primary dealers, the only ones in that group which file average quarterly numbers with U.S. regulators. The eight firms represent two-thirds of all repo borrowings by the 18-firm group. The other 10 are either foreign banks that don't have U.S. entities that report the numbers, or securities firms not required to file the numbers with bank regulators.
>
> . . .
>
> ***At Citigroup, average net repo borrowings have exceeded the bank's reported period-end debt by an average of 52% over the past 10 quarters,*** according to the analysis. . . .

(emphasis added)

98. Thus, not only did Citigroup face massive risks throughout the Class Period, those risks were not timely disclosed to the public or the Participants.

99. On information and belief, Defendants, and each of them, took no steps to protect the Plan from offering the Fund as an investment option for the Plan or blocking continued investment in the Fund throughout the Class Period, despite the Company's dire condition as set forth above. To the contrary, it appears that Defendants permitted the Plan to increase its holdings in Citigroup stock. During the Class Period, the number of shares in the Citigroup 401(k) Plan's Citigroup, Inc. Common Stock Fund increased. According to the 11-K Report filed with the SEC on June 24, 2009, the Fund held 72,949,002 shares of Citigroup Common Stock at the end of 2007. The same report indicates that the Fund held 91,341,613 shares of Citigroup Common Stock at the end of 2008, in the middle of the Class Period. According to the 11-K Report filed with the SEC on May 24, 2010, the Fund held 127,601,110 shares of Citigroup Common Stock as of December 31, 2009.

## COUNT I

### Failure to Prudently and Loyally Manage the Plan and the Plan's Assets

100. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

101. This Count alleges fiduciary breach against all Defendants other than the Director Defendants (the "Prudence Defendants").

102. As alleged above, during the Class Period, the Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by ERISA's duties of loyalty, exclusive purpose, and prudence.

103. As alleged above, the scope of the fiduciary duties and responsibilities of the Prudence Defendants included managing the assets of the Plan for the sole and exclusive benefit of the Participants and with the care, skill, diligence, and prudence required by ERISA. The

Prudence Defendants were directly responsible for, among other things, selecting and offering only prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the Plan and directing the trustee regarding the same, evaluating the merits of the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

104. According to Department of Labor regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, and (b) he has acted accordingly.

105. The Prudence Defendants were obliged to prudently and loyally manage all of the Plan's assets. However, their duties of prudence and loyalty were especially significant with respect to Company stock because: (a) Company stock was a particularly risky and volatile investment; and (b) Participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock.

106. The Prudence Defendants had a duty to follow a regular, appropriate systematic procedure to evaluate the prudence of investing in the Fund, but had no such procedure. Moreover, they failed to conduct an appropriate investigation of the merits of continued investment in the Fund. Given the widespread public disclosure of Citigroup's dire circumstances, such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to offer the Fund as an investment option or make and maintain investment in the Fund under these circumstances.

107. Contrary to their duties and obligations under ERISA, the Prudence Defendants failed to loyally and prudently manage the assets of the Plan. Specifically, during the Class Period, the Prudence Defendants knew or should have known that the Fund was no longer a suitable and appropriate investment for the Plan, but was, instead, an imprudent investment in light of widely available public information.

108. Nonetheless, during the Class Period, the Prudence Defendants continued to permit the Plan to offer the Fund as an investment option for Employee and Matching Contributions and continued to permit the Plan to invest in the Fund and permit the Fund to invest in Company stock. They did so despite the fact that they knew or should have known that Citigroup was in dire circumstances.

109. The Prudence Defendants breached their fiduciary duty respecting the Plan's investment in Company stock described above, under the circumstances alleged herein, in that a prudent fiduciary acting under similar circumstances would have made different investment decisions and, in particular, would not have permitted the Plan to invest in the Fund.

110. Given the information described above, the Prudence Defendants could not possibly have acted prudently when they continued to offer the Fund or invested the Plan's assets in Company stock because, among other reasons:

(a) The Prudence Defendants knew of and/or failed to investigate and/or failed to act upon the Company's dire circumstances as alleged above, and

(b) The risks associated with investment in Company stock during the Class Period were far above and beyond the normal, acceptable risks associated with investment in company stock.

111. Knowing of or failing to investigate these extraordinary risks, the Prudence Defendants had a duty to avoid permitting the Plan or the Participants from investing the Plan's assets in the Fund or Fund assets in Company stock.

112. Further, knowing that the Plan was heavily invested in Company stock, the Prudence Defendants had a heightened responsibility to divest the Plan of Company stock when it was imprudent.

113. The Prudence Defendants breached their fiduciary duties by, *inter alia*, failing to engage independent advisors who could make independent judgments concerning offering the Fund as an option or the Plan's investment in the Company; failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made Company stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to avoid adversely impacting their own compensation or drawing attention to the Company's dire circumstances, and by otherwise placing their own and the Company's improper interests above the interests of the Participants with respect to the Plan's investment in Company stock.

114. As a consequence of the Prudence Defendants' breaches of fiduciary duty alleged in this Count, the Plan suffered tremendous losses. If the Prudence Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the other Participants, lost millions of dollars of retirement savings.

115. Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Prudence Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT II

### Failure to Properly Appoint, Monitor and Inform Other Appointed Fiduciaries

116. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

117. This Count alleges fiduciary breach against the Director Defendants (the "Monitoring Defendants").

118. As alleged above, upon information and belief, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

119. As alleged above, the scope of the fiduciary responsibilities of the Director Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of the Committee.

120. Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

121. The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on"

fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

122. Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan's assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

123. The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a) failing, with respect to the Plan's investment in Company stock, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to Company stock;

(b) failing to ensure that the monitored fiduciaries appreciated the true extent of the risks of investing in the Fund, and the likely impact of such practices on the value of the Plan's investment in Company stock;

(c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees

such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets and, in particular, the Plan's investment in the Fund; and

(d) failing to remove appointees whose performance was inadequate when they continued to permit the Plan to make and maintain investments in the Fund despite the practices that rendered Company stock an imprudent investment during the Class Period.

124. As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses. If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan and indirectly Plaintiff and the other Participants lost millions of dollars of retirement savings.

125. Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## <u>COUNT III</u>

### Claims for Negligent Non-Disclosure and/or Misrepresentation in Fiduciary Communications and Communications Incorporated By Reference into Fiduciary Communications

126. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

127. Plaintiff realleges and incorporates herein by reference the allegations set forth above.

128. Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

129. Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.

130. Defendants breached these fiduciaries in that they made material misrepresentations and nondisclosures as alleged or incorporated material misrepresentations and nondisclosures into fiduciary communications.

131. Defendants, who included Citigroup's controller, assistant treasurer, chief investment officer, a risk manager and other high-ranking employees, knew or should have known by virtue of their positions with the Company that Citigroup's average net repo borrowings exceeded the bank's reported period-end debt by a large amount during the Class Period, and that, as a result, the quarter-end numbers which were incorporated by reference into fiduciary communications, in the words of Robert Willens, an accounting specialist who heads Robert Willens LLC, "are at best meaningless and at worst misleading and disingenuous." (*see supra* ¶ 97).

132. Defendants did nothing to clarify such information despite the fact that clarifying such information was both (1) necessary to avoid misleading participants and (2) related to Plan benefits in the form of Company stock, because the benefits of the Plan were, in large part, a function of the value of Company stock, and because Participants overpaying for excessively

risky stock was contrary to the Plan's purpose and was a waste of Participants' retirement savings.

133. Through the Class Period, Citigroup repeatedly publicly represented that it was well capitalized and undertaking significant risk-reductions. For example, in its Form 10-Q filed with the SEC on October 31, 2008—which was a Friday and the Class Period begins the following Monday—Citigroup represented, *inter alia*, that "[o]ur liquidity position also remained very strong during the third quarter of 2008 and will continue to be enhanced through the sale to the U.S. Department of the Treasury of perpetual preferred stock and a warrant to purchase common stock, the sale of the German Retail Banking Operations and continued balance sheet de-leveraging[,]" and that "[o]ur reserves of cash and highly liquid securities stood at approximately $51 billion at September 30, 2008, up from $24 billion at December 31, 2007. Continued de-leveraging and the enhancement of our liquidity position have allowed us to continue to maintain sufficient liquidity to meet all debt obligations maturing within a one-year period without having to access unsecured capital markets." Similarly, in Exhibit 99.1 to a Form 8-K filed with the SEC on January 16, 2009 in which Citigroup publicly reported a fourth quarter 2008 net loss of $8.29 billion, or $1.72 per share, Citigroup continued to blame its financial condition on the economy, largely ignoring that the Company had put itself in a precarious position by its excessive risk taking. Exhibit 99.1 stated in relevant part:

> Our results continued to be depressed by an unprecedented dislocation in capital markets and a weak economy. However, a number of our core customer franchise continued to perform well as Citi's customers remain active and engaged with us. ***We continued to make progress on our primary goal in 2008—which was to get fit.*** We significantly strengthened Tier 1 and structural liquidity, we reduced our balance sheet, expenses, and headcount. We also made significant progress in reducing risk from our balance sheet. Our legacy assets declined to approximately $300 billion, over $300 billion of assets are now covered by a loss

> sharing arrangement, and we added $14 billion to our loan loss reserves. We expect reduced volatility from marks in 2009 as a result of actions we've taken to reduce risk, reclassify certain securities and loans from trading and available or hold for sale to hold to maturity or held for investment.

(emphasis added).

134. Citigroup amended its January 16, 2009-reported $8.29 billion quarterly net loss figures in a February 27, 2009 Form 8-K, in which it announced a fourth quarter 2008 goodwill impairment of $9.6 billion, and other charges, after which the net loss from continuing operations in 2008 was $32.1 billion and the overall net loss was $27.7 billion, resulting in diluted earnings per share of $(6.42) and $(5.59) respectively.

135. Defendants allowed materially incorrect reports of Citigroup's financial condition and results of operation, most of which were made in SEC filings, to be incorporated by reference into fiduciary communications, concealing that, in reality, the steps which had been taken and which were being taken by the Company "to get fit" were wholly inadequate, and that Citigroup was inadequately capitalized, overexposed to mortgage-related investments, on the verge of bankruptcy, and would ultimately collapse but for a series of unprecedented bailouts by the federal government. As a result of these materially misleading statements, the price of Citigroup stock, and of Fund units, was artificially inflated during the Class Period. This further rendered Citigroup stock imprudent for the Plan.

136. In addition to the deception about Citigroup's financial condition and results of operations, liquidity and the supposedly successful results of its efforts "to get fit" in the SEC filings which were incorporated into fiduciary communications, on November 17, 2008, Defendant Pandit, on behalf of Citigroup, transmitted a memorandum to substantially all Citigroup employees touting the Company's future prospects, advising Participants that Citigroup's "underlying business remains strong", stating that risk management is strong and that

the Company is in a "very strong capital position", and that the Company "in a strong competitive position to take advantage of future opportunities. We will be the long-term winner in the industry." This was just five days before Citigroup was back in talks with the federal government on how to rescue the Company from its dire circumstances. These November 17, 2008 statements to substantially all Citigroup employees deceived Participants about the true risk and return characteristics of Citigroup stock.

137. The Participants relied upon and/or are presumed to have relied upon Defendants' material misrepresentations and nondisclosures to their detriment.

138. As a consequence of Defendants' material misrepresentations and misleading omissions, the Plan suffered losses.

139. Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

140. Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

## COUNT IV

### Co-Fiduciary Liability

141. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

142. This Count alleges co-fiduciary liability against all Defendants (the "Co-Fiduciary Defendants").

143. As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

144. As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Co-Fiduciary Defendants breached all three provisions.

145. ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Upon information and belief, each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches. In particular, they did not communicate their knowledge of the Company's illegal activity to the other fiduciaries.

146. In particular, because the Director Defendants knew of the Company's failures and inappropriate business practices, they also knew that the Prudence Defendants were breaching their duties by continuing to invest in Company stock. Yet, they failed to undertake any effort to remedy these breaches and, instead, compounded them by downplaying the significance of the Company's failed and inappropriate business practices and obfuscating the risk that the practices posed to the Company, and, thus, to the Plan.

147. ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. The Monitoring Defendants knowingly participated in the breaches of the Prudence Defendants because, as alleged above, they had

actual knowledge of the facts that rendered Company stock an imprudent retirement investment and, yet, ignoring their oversight responsibilities, permitted the Prudence Defendants to breach their duties. Moreover, as alleged above, each of the Defendants participated in the management of the Plan's improper investment in the Fund and, upon information and belief, knowingly participated in the improper management of that investment by the other Defendants.

148. ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

149. The Monitoring Defendants' failure to monitor the Prudence Defendants enabled those Defendants to breach their duties.

150. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants and beneficiaries, lost millions of dollars of retirement savings.

151. Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## THE BREACHES OF FIDUCIARY DUTY COMPLAINED OF HEREIN HAVE CAUSED SIGNIFICANT DOLLARS OF LOSSES TO THE PLAN AND THE PARTICIPANTS

152. The Plan and the Participants have suffered at least millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants' breaches of fiduciary duties, in the Fund. These losses were reflected in the diminished account balances of the Participants.

153. Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and participants would have avoided all or at least a substantial portion of the losses that they suffered through their continued investment in the Company stock.

**REMEDIES FOR BREACHES OF FIDUCIARY**

154. Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above and, therefore, knew or should have known that the Plan's assets should not have been invested in the Fund during the Class Period.

155. As a consequence of Defendants' breaches, the Plan suffered a significant loss of vested benefits.

156. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary who breaches any of the duties imposed upon fiduciaries to make good to such plan any losses to the plan." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

157. Plaintiff and the Participants are therefore entitled to relief from Defendants in the form of:

(a) a monetary payment to the Plan to make good to the Plan the loss of benefits to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a);

(b) appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA§§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3);

(c) reasonable attorneys' fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law;

(d) taxable costs and interest on these amounts, as provided by law; and

(e) such other legal and/or equitable relief as may be just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for:

A. A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B. An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including loss of vested benefits to the Plan resulting from imprudent investment of the Plan's assets; to restore to the Plan all profits the Defendants made through use of the Plan's assets; and to restore to the Plan all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

C. Actual damages in the amount of any losses suffered by the Plan or by the Participants, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

D. An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

E. An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

F. An Order for equitable restitution and other appropriate equitable relief.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated: December 8, 2011

**STULL, STULL & BRODY**

By: ______________________

Edwin J. Mills
emills@ssbny.com
Howard T. Longman
hlongman@ssbny.com
Michael J. Klein
mklein@ssbny.com
6 East 45th Street
New York, New York 10017
Tel: (212) 687-7230
Fax: (212) 490-2022

*Attorneys for Plaintiff*